## DEAL MEMO AGREEMENT Showtime Networks Inc. ("SNI")

| | | | |
|---|---|---|---|
| **LICENSOR:** [exact legal name/address] | 214 Films Entertainment Group, Inc.<br>2905 Lake East Drive, Suite 150<br>Las Vegas, NV 89117 | **DATE:**<br>**ACCOUNT EXECUTIVE:** | 10/16/2014<br>Gabriel Gazoul<br>gabriel.gazoul@Showtime.net |

**LICENSOR CONTACT:** Zatella Beatty; zatella@214films.com
(818) 209-4761

**SALES CONTACT:** Alan Gasmer; agasmer@mac.com
(310) 208-7338

**LEGAL CONTACT:** Kevin Garlitz; kgarlitz@loeb.com
c/o Loeb & Loeb LLP
(310) 282-2392

**DELIVERY CONTACT:** Steve Perry; steve@214films.com
(323) 666-2345

| TITLE (each, a "Picture") [exactly as it appears on master] | 1st EXH/ COMPLTN YR | U.S. RLS* | POST 1998** | LICENSE PERIOD START-END | SNI SERVICES | LICENSE FEE | MPAA | TYPE | BUD |
|---|---|---|---|---|---|---|---|---|---|
| IVERSON | 11/2014 | 2015 | Y | 05/01/2015-04/30/2017 | All SNI | $325,000 | N/A | Doc. | C |

\* Year of first commercial exhibition in U.S.    \*\* First exhibition (including film festivals) anywhere in world occurred after 1/1/98

**The SNI Standard Terms and Conditions are attached hereto and Incorporated herein.**

**214 FILMS ENTERTAINMENT GROUP, INC.**
(Fed. I.D. #:47-1335815)
By: _[signature]_
Name: ZATELLA BEATTY
Its: PRESIDENT

**SHOWTIME NETWORKS INC.**
By: _[signature]_
Name: H. Gwen Marcus
Its: EVP & General Counsel

1

w:\wshared\...\kevin\contracts\sni\214 Films 1c.doc

## SNI STANDARD TERMS AND CONDITIONS

**1. GRANT OF RIGHTS:** For good and valuable consideration, the receipt and sufficiency of which the parties hereto hereby acknowledge, Licensor hereby grants to SNI the exclusive right, title, and license to "Distribute" (including in "High Definition" and "Standard Definition," and with or without closed captioning) each "Picture" on "Pay Services" in the English and Spanish languages throughout the "Territory" during such Picture's "License Period" (as such terms are defined herein), subject to all of the terms and conditions set forth herein.

**2. TERRITORY:** U.S. (including its territories, possessions and commonwealths, including Puerto Rico), all U.S. military installations (including military ships) wherever located, Bermuda, the Bahamas and the Caribbean Basin.

**3. EXCLUSIVITY:** Licensor represents, warrants, and agrees that other than festival/market screenings: (x) neither the Picture nor any version (including, without limitation, foreign language and cut and edited versions) of the Picture has been Distributed throughout the world (or any portion thereof) in any media (including without limitation the Internet) prior to the commencement of the Picture's License Period, and (y) neither the Picture nor any version of the Picture shall be Distributed throughout the world (or any portion thereof) in any media now or hereafter known (including without limitation the Internet) until the end of the License Period; except that:

(A) <u>commencing on the date that is seven (7) days following the commencement of the License Period and continuing thereafter</u>, the Picture may be Distributed outside the Territory without restriction except that Licensor shall neither Distribute nor permit others to Distribute the Picture in Mexico or Canada <u>via terrestrial broadcast television</u> systems that Licensor is aware have signals that carry into or within the Territory. SNI acknowledges that transmissions of the Picture by other licensees of Licensor outside of the Territory (solely by the use of satellite transmission) may overspill into the Territory and agrees that such overspill shall not constitute a breach of this Agreement (so long as the overspill is not the result of programs being distributed via any such broadcast television systems);

(B) in addition to the Distribution permitted in 3(A) and 3(B) above, <u>commencing on the date that is ninety (90) days following the first day of the License Period and continuing thereafter</u>, the Picture may solely be Distributed (and such Distribution may be advertised, promoted and publicized) in the Territory: (i) "theatrically" and/or "non-theatrically" (as such terms are commonly understood in the U.S. entertainment industry), and (ii) by means of "Home Video", "Pay Per View", "Video On Demand" and "Video Downloading" (as such terms are defined below);

AND

(C) in addition to the Distribution permitted in 3(A) - 3(C) above, <u>commencing on the date that is twelve (12) months following the first day of the License Period and continuing thereafter</u>, the Picture may be Distributed in the Territory on a third-party Pay Service(s) Distributed solely via the Internet (e.g., "Netflix Watch Now") (but excluding in all events (x) any such Pay Service that is HBO-, Cinemax-, Starz-, Encore- or Epix-branded and (y) any such Pay Service(s) (e.g., "Blockbuster") that is wholly or partially owned and/or operated (whether directly or indirectly) by an entity that Distributes (whether via the Internet or otherwise) any SNI Service) provided that no such permitted service(s) shall be offered to a consumer for a subscription period that is less than one month in duration.

w:\lwshared\...\kevin\contracts\sni\214 Films 1c.doc

Licensor shall use its commercially reasonable efforts to promptly terminate any unauthorized Distribution of the Picture (or portion thereof) or any Distribution not permitted hereunder in the Territory if it has knowledge (either directly or as informed by SNI or any third-party) of any illegal or non-permitted Internet Distribution of the Picture (or portion thereof).

**4. LICENSE FEE:** In full consideration of all rights granted in, and materials furnished in connection with, the Picture hereunder, SNI shall pay to Licensor a license fee (the "License Fee") in the amount of Three Hundred Twenty-five Thousand Dollars (US$325,000) payable on the date that is thirty (30) days following the commencement of the Picture's License Period, but in no event prior to Licensor's complete delivery of all items required hereunder (including a completed U.S. tax form W-9).

**5. EXHIBITION DAYS:** 150, in the aggregate. "Exhibition Day" means, with respect to a given channel of an SNI Service on which the Picture is exhibited on a Sequential Basis, any period of 24 consecutive hours, which may consist of parts of more than one calendar day, during which such Picture may be exhibited up to three (3) times. Licensor hereby agrees that with respect to exhibitions of the Picture on an SNI Service made available on an "SVOD Basis" (as defined below), restrictions on the maximum number of Exhibition Days or exhibitions per Exhibition Day hereunder shall not apply. For the avoidance of doubt, the parties acknowledge and agree that Exhibition Days during which the Picture is exhibited on a second (or more) substantially similar "feed" of a given Sequential Basis channel of an SNI Service (e.g., an east coast feed of SHO 1), a west coast feed of SHO 1, and a high-definition feed of SHO 1) shall not be counted as Exhibition Days or exhibitions incremental to those taken on the first feed of such channel for any purpose hereunder.

**6. DELIVERY/VERSIONS OF THE PICTURE:** Licensor, at its expense, will create (or cause to be created) an English-language, closed-captioned NTSC Digital Betacam master of the Picture along with a closed-captioned true high definition HDcam master of the Picture transferred from film elements or shot in high definition in its original aspect ratio and deliver to SNI a dubbed copy of each such master (the "Dubbed Masters"). Dubbed Masters must comply with SNI's Standard Definition and High Definition technical specifications annexed hereto and made a part hereof. If any other versions of the Picture have been made (for example, a dubbed Spanish-language and/or letterbox version) (the "Additional Versions") and are available at no cost to Licensor, then Licensor will also deliver such Additional Versions to SNI at no cost to SNI. SNI has the right to create any such versions, and Licensor will make available to SNI, at no cost to SNI, all materials, available to Licensor at no cost to Licensor, necessary for SNI to do so. The Pictures may be Distributed on any and/or all of the SNI Services in any analog and/or digital format(s) (including high definition formats and with any accompanying Dolby 5.1 audio track(s)). Without limiting any of SNI's rights hereunder, SNI shall have the right to accelerate the Picture's credits and/or squeeze such credits, and compress, down-convert, scale, up-convert, pan and scan, center cut and/or alter the resolution of such Picture. Licensor will also deliver to SNI the following (the "Ancillary Materials") for the Picture: master music cue sheet, memorandum of credit obligations, story synopsis (400-500 characters in length), electronic press kit (with 1080i/59.94i HDCam split track trailer: Audio: Ch 1: Dialogue; Ch 2: Music; Ch 3: Unfilled Effects; Ch 4: Mono English Comp.), 10 to 20 digital photographs (color) minimum of 4x6 inches at 300 dpi (8x12 inches at 300 dpi preferred), key art or poster art (24x36 inches at 300dpi) with and without a title treatment, and an E&O certificate (per paragraph 7 below)).

Licensor shall promptly deliver all of the above-referenced materials when so requested by a representative of SNI, but in no event later than April 1, 2015. **Dubbed Masters, other**

existing NTSC versions and Additional Versions of a Picture shall be delivered to SNI at 1633 Broadway, NY, NY 10019, Attn: Sara Shacket, 17th Fl.  Ancillary Materials shall be delivered to SNI at 1633 Broadway, NY, NY, 10019, Attn: Kevin Young, Law Department, 16th Fl.

**7. E&O INSURANCE:**  Licensor, at its expense and for the duration of the License Period for the Picture, will secure and maintain producer's liability (errors and omissions) insurance in the minimum amount of $1,000,000 per claim and $3,000,000 in the aggregate and shall deliver to SNI a certificate of such insurance, in a form satisfactory to SNI.  Such certificate must provide that such insurance (a) cannot be modified, terminated or canceled by the carrier without its first notifying SNI of such event, and (b) is not subject to any non-standard exclusions from, restrictions of or limitations in coverage or a deductible greater than $10,000.  Such policy shall name as additional insureds **Showtime Networks Inc., its parent, subsidiary and affiliated companies, successors, licensees and assigns and the respective officers, directors, agents and employees of any and all of the foregoing** and shall contain an endorsement that negates the "other insurance" clause in the policy and a statement that the insurance being provided is primary and that any errors and omissions insurance carried by SNI or any other person or entity (other than Licensor) is neither primary nor contributing.

**8. DEFINITIONS:**

(a) "Commercial" means a paid advertisement (*e.g.*, a 30-second segment) primarily featuring or describing a third-party product or service; provided, however, that none of the following shall be deemed to be a Commercial:  (1) presentation and sponsorship credits; (2) billboards, signboards, and product placements intrinsic in a given motion picture, television program, or other audiovisual content; (3) offers to acquire (on a permanent or temporary basis) a download, DVD or other copy(ies) of a given motion picture, television program, or other audiovisual content that is Distributed on the applicable Pay Service; and (4) information or announcements about how and/or where to obtain information about a given product or service (but only if such product or service is directly related to a given motion picture, television program, or other audiovisual content that is Distributed on the applicable Pay Service) (*e.g.*, identification of a website where consumers can obtain more information about the songs appearing in a particular program).

(b) "Delivery Methods" means any and all methods, protocols, software applications and technologies now known or hereafter developed, including any and all transmission paths now known or hereafter developed (including but not limited to satellite, cable, copper, Internet (streaming and downloading), microwave, optical fiber, wireless, electrical wire, cellular or any other radio spectrum), to, or for use by or on, any receiving, playback and/or display device now known or hereafter developed (including but not limited to set-top boxes, DVR's, computers, modems, smart phones, handheld and/or portable devices, monitors, televisions, gaming consoles and devices accessing content via any user interface (including but not limited to browsers, websites, apps and guides)).

(c) "High-Definition" or "HD" means any format with a vertical resolution equal to or greater than 720 lines.

(d) "Home Video" distribution means the Distribution of one or more versions of a single motion picture (together, if applicable, with related ancillary materials (*e.g.*, "behind the scenes" footage), but excluding other motion pictures) (X) on audio-visual cassettes, discs or other form of physical storage media (*e.g.*, a USB stick) or comparable physical memory devices to and

from retail outlets for the intended purpose of non-commercial viewing of such motion picture by consumers; and/or (Y) electronically to a device under circumstances whereby the recipient purchases title to and ownership of an electronic copy of such motion picture (including the right to view such electronic copy of such motion picture an unlimited number of times) in exchange for the payment of a distinct, material and separate non-recurring fee (which non-recurring fee does not include the receipt by such recipient of any other motion picture(s), program(s), product(s) or service(s)).

(e) "Look Back" means functionality whereby a consumer may access on an SVOD basis Content that was Distributed on a Sequential Basis within the preceding seven (7) days.

(f) "Pay Per View" means the Distribution via any one or more Delivery Methods of a single motion picture on a Sequential Basis for viewing by an individual consumer, whereby a consumer purchases, on a non-de minimis, non-recurring fee-per-individual motion picture basis, the right to view a single exhibition (or multiple exhibitions within a single, continuous period of up to forty-eight (48) hours) of such motion picture in circumstances where such consumer accesses and views such exhibition(s) at a time(s) scheduled by a Pay Per View distributor.

(g) "Pay Service" means a service that distributes, delivers, exhibits, performs, displays and/or otherwise exploits (collectively, "Distribute" or "Distribution") Programming using any one or more Delivery Methods and that satisfies the following requirements: (X) it does not contain Commercials; and (Y) a consumer (or an institution (e.g., a hotel or motel)) is required to pay on a periodic basis a fee to receive such service (or to receive a package of Pay Services and/or other services including such service).

(h) "Programming" means a collection of motion pictures, television programs and/or other audiovisual content, which collection may be fixed or may change in whole or in part over time, that is offered on a Sequential Basis and/or SVOD Basis.

(i) "Sequential Basis" means Distribution of Programming in a continuous linear transmission (with or without Look Back and/or Start Over functionality) in an order determined by the programmer of the service on which such Programming is Distributed.

(j) "SNI Services" means (X) "Showtime"-branded, "The Movie Channel"-branded and "FLIX"-branded Pay Services (and any and all feeds, services and like-branded offerings of all of the foregoing); and (Y) any and all other Pay Services owned, operated, managed, controlled and/or branded, in whole or in part, by SNI; and (Z) the successors of each of the foregoing Pay Services.

(k) "Standard Definition" or "SD" means any format with a vertical resolution of less than 720 lines.

(l) "Start Over" means functionality whereby a consumer may rewind or restart content that is then in the process of being Distributed on a Sequential Basis.

(m) "SVOD Basis" means Distribution of Programming on an "on demand" access basis, whereby a consumer may select the time(s) for viewing given content in such Programming.

(n) "Video Downloading" which means the electronic or other non-tangible transmission of a single copy of a single motion picture to any device under circumstances whereby the

recipient of such transmission purchases, in exchange for the payment of a distinct, material and separate non-recurring fee which non-recurring fee does not include the receipt by such recipient of any other motion picture(s), program(s), product(s) or service(s), title to and ownership of such copy (including the right without restriction to view such copy of such motion picture an unlimited number of times).

(o) "Video On Demand" means the Distribution via any one or more Delivery Methods of a single motion picture for viewing by an individual consumer, whereby a consumer purchases, on a non-de minimis, non-recurring, fee-per-individual motion picture basis, the right to view a single exhibition (or multiple exhibitions within a single, continuous period of up to forty-eight (48) hours) of such motion picture in circumstances where such consumer accesses and views such exhibition(s) at a time(s) selected by the consumer in such consumer's discretion.

**9. DELIVERY METHODS:** The SNI Services may be Distributed via any and all Delivery Methods and may include without limitation the storage, copying, downloading and/or transfer of the Picture on an SNI Service to one or more devices, provided that any authorized viewing of such stored, copied, downloaded or transferred Picture shall be limited to such Picture's License Period(s). SNI shall employ (or cause to be employed) reasonable security methods (including encryption, copy protection, digital rights management and geofiltering) designed to prevent unauthorized access to each Picture Distributed on the SNI Services, which methods shall be no less stringent than those employed by SNI with respect to theatrical motion pictures in the same window being licensed by SNI from the major studio(s) and/or mini-major studio(s). Notwithstanding the foregoing, Licensor acknowledges and agrees that neither SNI (nor any other person or entity authorized by SNI to Distribute the SNI Services) shall be responsible or liable in the event a consumer engages in any unauthorized viewing, storage, copying, downloading, transferring and/or other exploitation of the Picture.

**10. ADVERTISING AND PREVIEW RIGHTS:**

(a) SNI may advertise, promote and publicize the Picture and/or SNI Services in any and all media at any time from the date hereof and through the end of the Picture's License Period and may authorize third parties to do so (the "Advertising Rights"). The Advertising Rights include, without limitation, the right to use excerpts of the Picture (not to exceed 3 minutes in the aggregate) and the name, approved image, approved likeness and voice of, and approved biographical information (it being agreed that all images, likenesses and biographical material delivered to SNI by Licensor is deemed approved) relating to, anyone who rendered services in or in connection with the Picture (subject to reasonable contractual restrictions of which Licensor timely notifies SNI in writing). In addition to the foregoing, the Advertising Rights include, without limitation, the right to use all or any part(s) of the trailers for the Picture provided by Licensor to SNI hereunder in the electronic press kit. The name of the applicable SNI Service (or channel thereof) and/or its trademark and/or logo may be displayed during the Distribution of the Picture thereon, , provided that such display is customary size so as not to interfere with the viewing of the Picture and consistent with how it is displayed with all other motion picture titles licensed by SNI.

(b) During the Picture's License Period, SNI may, without the payment of any additional sums to Licensor, Distribute the Picture, and authorize others to do the same, over the facilities of any SNI Service operator or distributor to: (i) persons who are not then currently receiving the SNI Service(s) as part of six (6) national preview exhibitions of the Picture per each channel of each SNI Service, it being agreed that SNI's rights with respect to non-national previews of such

Picture are unrestricted), (ii) stores and showrooms for the purpose of demonstrating the SNI Services and/or DBS and/or HTVRO or other equipment or devices to members of the general public.

(c) The initial press release/media announcement with respect to this Agreement is subject to the prior written approval of Licensor and SNI (any such approval not to be withheld or delayed by the parties). No statement, press release or other form of publicity of any kind about SNI or SNI's exhibition of the Picture (including by conversations or electronic means (e.g., Twitter, Facebook, email, text messages)) to any form of press, media or the public, should be issued or authorized by Licensor without SNI's prior written consent except that following the initial press release, Licensor may make incidental, non-derogatory, factual public statements (but not a press release) regarding the exhibition of the Picture by SNI so long as such statement does not imply any endorsement by SNI of any entity, service or product.

## 11. LICENSOR'S REPRESENTATIONS, WARRANTIES AND COVENANTS:

Licensor represents, warrants and covenants with respect to the Picture that:

(i) it has all the rights and authority necessary to enter into this Agreement and perform its obligations hereunder and to grant all rights granted or purported to be granted herein (including without limitation the right to use performers' names, images, voices, likenesses and biographies as contemplated herein); to the best of Licensor's knowledge, nothing contained in the Picture, nor the entering into or performing of this Agreement, nor the exercise of any of the rights granted hereunder, will violate any applicable law or governmental rule or regulation, violate or infringe upon any rights whatsoever (including, without limitation, any copyright, trademark, moral right or other proprietary right or interest) of any third persons or entities or result in any other liability;

(ii) it owns or controls, and grants to SNI hereunder for no additional consideration, all the rights with respect to any music contained in the Picture (in context only) that are required in connection with the Distribution of the Picture and Advertising Rights in accordance with this Agreement (including without limitation performance rights), except to the extent that the non-dramatic performance rights in musical compositions that are necessary to Distribute the Picture on the SNI Services are controlled by ASCAP or BMI or SESAC or are in the public domain (it being agreed that, as between Licensor and SNI, SNI shall be responsible for making all payments which may be required to be paid to ASCAP or BMI or SESAC with respect to non-dramatic performance rights in musical compositions on account of SNI's Distribution of the Picture on the SNI Services hereunder);

(iii) the Picture is and will be protected by copyright in the Territory throughout the duration of this Agreement and has been registered in the United States Copyright Office in Washington, D.C. for copyright protection;

(iv) it has paid or will cause to be paid all charges, taxes, license fees, residuals, reuse, rerun, pension and health and welfare fund payments, and payroll tax payments or other payments due to any person (including, without limitation, any union, guild, actor, director, craftsman or performer) by virtue of any authorized use made of the Picture hereunder (including in connection with the Advertising Rights), and other amounts that have been or may become owed in connection with the Picture or SNI's exercise of the rights granted to it hereunder, and to the best of Licensor's knowledge, there are not pending any claims, litigations, liens, charges, restrictions or encumbrances on the Picture or on such rights that

would (x) interfere with SNI's rights hereunder or (y) require SNI to make any payments on account of SNI's exercise of such rights (other than the License Fee for the Picture and any payments to ASCAP or BMI or SESAC that may be required under Paragraph 11(ii) above);

    (v)   the Picture does not contain any depiction of "Actual" (i.e., the performer was actually engaged in the applicable act while being filmed) human sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal, whether between those of same or opposite sex), bestiality, masturbation, or sadistic or masochistic abuse (collectively, "Sexually Explicit Conduct"); and

    (vi)   the Picture does not contain any depiction of any lascivious exhibition of a performer's genitals or pubic area – including that which may be clothed ("Lascivious Exhibition") or any "Simulated" (i.e., the applicable act is depicted in the Picture in a manner causing a reasonable viewer to believe the performers engaged in such act notwithstanding that they did not actually do so) "Sexually Explicit Conduct" (as defined in Paragraph 11(v) above).

**11A.   SEXUALLY EXPLICIT CONDUCT:** In the event that SNI, at any time in the good faith exercise of its legal judgment, determines that, contrary to the above representations and warranties, the Picture contains a depiction of Actual or Simulated Sexually Explicit Conduct or Lascivious Exhibition, then SNI shall have the right, without limiting any of its other rights or remedies, to (x) require Licensor to promptly deliver to SNI such documents and take such steps relating to such Picture as SNI may require, in connection with U.S. laws concerning depictions of Actual or Simulated Sexually Explicit Conduct or Lascivious Exhibition, and/or (y) terminate this Agreement with respect to such Picture upon notice to Licensor (including termination of SNI's obligation to pay a License Fee with respect to such Picture).

**12.   INDEMNIFICATION:**

    (a)   Licensor shall defend, indemnify and hold harmless SNI and SNI's parent, subsidiary and affiliated companies, successors, licensees and assigns and their respective shareholders, officers, directors, employees and agents (collectively, "Related Entities"), against and from any and all claims, damages, losses, liabilities, costs and expenses (including, without limitation, reasonable fees and disbursements of outside counsel) (collectively, "Claims") incurred by SNI in any action, claim or proceeding between SNI and any third party, arising out of the proper exercise of any rights granted herein or out of any breach or allegation by a third party of a breach by Licensor of any representation, warranty, covenant (including Paragraphs 11(i) and 11(vi) above without giving effect to the words "to the best of Licensor's knowledge") or other provision hereof, except to the extent arising from a matter for which SNI indemnifies Licensor pursuant to this Paragraph 15 below.  SNI shall defend, indemnify and hold harmless Licensor and Licensor's Related Entities against and from any and all Claims incurred by Licensor in any action, claim or proceeding between Licensor and any third party or otherwise, arising out any breach or allegation by a third party of a breach by SNI of any representation, warranty, covenant or other provision hereof and SNI's (or any sublicensee's) exploitation of the Picture or any element thereof in a manner that is not authorized hereunder.

    (b)   In order to seek or receive indemnification, the party seeking indemnification (the "indemnitee") shall promptly notify the other party (the "indemnitor") of each Claim and shall afford the indemnitor the opportunity to participate in any compromise, settlement, litigation or other resolution of such Claim, or, at the election of the indemnitee, shall require the indemnitor to assume the defense of any such Claim, with counsel of the indemnitor's own choosing; provided, however, that if the indemnitor is required to assume such defense, the indemnitee

shall have the opportunity to participate fully in such defense at the indemnitee's expense. Neither party shall compromise, settle or otherwise resolve such Claim without the other party's prior written consent, not to be unreasonably withheld; provided, however, that failure to respond within ten business days following receipt of written notice of such proposed compromise, settlement or resolution shall constitute consent to the proposed compromise, settlement or resolution.

13. **MISCELLANEOUS:**

    This Agreement (which consists of the Deal Memo Agreement and the SNI Standard Terms and Conditions), and the rights and obligations of the parties hereunder shall inure to the benefit of and be binding upon the parties' successors, licensees and assigns; provided, however, that (i) Licensor may not assign or transfer this Agreement, or any of its rights or obligations hereunder, without the prior written consent of SNI, and (ii) solely for the purposes of this Agreement and on a non-precedential basis, SNI may only assign this Agreement, or any of its rights or obligations hereunder, to any parent, subsidiary or affiliated company, and to any successor-in-interest as the result of any merger, consolidation or sale of all or substantially all of its assets, without the prior written consent of Licensor. Any purported assignment or transfer in violation of the foregoing shall be null, void and not enforceable. This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and no terms, obligations, representations, promises, conditions (whether written or oral, express or implied) relating to the subject matter hereof have been made or relied upon, other than those contained herein. Neither Licensor nor SNI shall disclose to any third party the financial terms of this Agreement except to the extent necessary to: (a) comply with law or the valid order of a court of competent jurisdiction, in which event(s) the party making such disclosure shall so notify the other as promptly as practicable (if possible, prior to making such disclosure), and shall seek confidential treatment of such information, (b) comply with S.E.C. or similar disclosure requirements under applicable laws, (c) conduct its normal reporting or review procedure to its parent and affiliated companies, their banks, auditors, attorneys, and similar professionals, provided such entities and professionals have a duty of confidentiality or agree to be bound by these confidentiality provisions, and (d) enforce its rights hereunder. This Agreement may not be modified, nor may any provision be waived, except in a writing signed by both parties hereto. No payment under this Agreement shall operate as a waiver of any provision hereof. No waiver of any breach or default under this Agreement shall operate as a waiver of any preceding or subsequent breach or default. THIS AGREEMENT SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED ENTIRELY THEREIN. EACH PARTY IRREVOCABLY AGREES THAT THE STATE AND FEDERAL COURTS LOCATED IN NEW YORK CITY SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY SUIT OR OTHER PROCEEDING ARISING OUT OF OR BASED UPON THIS AGREEMENT, AND EACH WAIVES ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF SAID COURTS OR THAT ANY SUCH SUIT OR OTHER PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR IMPROPER VENUE.

    **NOTE: All contractual/payment inquiries and all legal documents (including notices) should be forwarded to:**

**Kevin Young**
**C/o Law Department**
**Showtime Networks Inc.**

w:\lwshared\...\kevin\contracts\sni\214 Films 1c.doc

1633 Broadway, 16th Fl.
New York, NY  10019
Tel: 212-708-1354   Fax: 212-708-1391
Kevin.young@showtime.net