Exhibit 21

# OPTION/PURCHASE AGREEMENT

This agreement ("Agreement") is entered into as of August 22, 2008 between C4 Pictures, Inc. ("Owner") and 214 Films, Inc. ("Purchaser"), with respect to an exclusive option to acquire all domestic motion picture, television, allied and ancillary rights in and to the concept, literary, audio and audiovisual material created, developed and produced by C4 featuring and regarding NBA player Allen Iverson (collectively referred to as the "Property") and the development of a feature documentary based on said Property ("the Picture").

**CONDITIONS PRECEDENT.**
All of Purchaser's obligations hereunder are conditioned upon Purchaser's receipt of a copy of this Agreement executed by Owner.

**I.   OPTION.**

    1.1   Grant: Subject to the reserved rights in Paragraph 4 herein, Owner hereby grant to Purchaser the exclusive and irrevocable right to purchase all domestic motion picture, television, and allied and ancillary rights in and to the Property (the "Option"), as more particularly set forth in Paragraph 3 herein. For purposes of this Agreement, "domestic" as used herein, shall mean and refer to the United States and Canada territories. "Foreign" as used herein, shall mean and refer all other territories outside of the United States and Canada.

    1.2   Option Period and Payment. The foregoing Option shall commence on the date hereof and shall continue until six (6) months from the date hereof ("Initial Option Period"). In consideration of the grant of the Option, Purchaser shall pay Owner the sum of One Dollar ($1.00), such payment shall not be applicable against the Purchase Price (as defined below), and perform certain development and pre-production functions outlined in Section 2 below. Provided that bona fide negotiations for the financing, production or distribution of a feature documentary based on the Property have commenced during the Initial Option Period, Purchaser shall have the right to extend the Initial Option Period for an additional six (6) month period ("Option Extension Period" or "Extended Term") by written notice to Owner accompanied by payment of One Thousand Dollars ($1000.00) prior to the expiration of the Initial Option Period, such payment shall be applicable against the Purchase Price. The Initial Option Period and the Option Extension Period together shall be referred to as the "Option Period." In the event that the Option Period would otherwise expire on a Saturday, Sunday or national holiday, it shall be automatically extended without notice until the end of the next business day.

    1.3   Other Extensions: In the event that a claim is asserted by a third party (whether or not resulting in litigation) which involves the breach of any of Owner's representations, warranties or agreements contained herein, or in the event of Owner's material default, the Option Period shall automatically be extended for a period of time equal to the period of time in which such claim is outstanding or unresolved, but in no event shall such extension exceed six (6) months, unless

litigation has commenced. In addition, if there shall be an event of force majeure (as that term is customarily defined in the entertainment industry) including, without limitation, any strike, walkout or other work stoppage by any union, guild or other labor organization against motion picture producers during the Option Period which materially and directly interferes with Purchaser's development of the Property, the Option Period shall automatically be extended by a period equal to the duration of such event of force majeure, but in no event shall such extension exceed twelve (12) months in the aggregate.

1.4 Exercise of Option: Purchaser shall be entitled to exercise the Option by written notice to Owner accompanied by payment of the Purchase Price (as set forth in Paragraph 2 below) at any time prior to expiration of the Option Period. Commencing principal photography of the first documentary or theatrical motion picture based upon the Property produced hereunder (the "Picture"), or the execution of any deal with a third party for the distribution, licensing or broadcast of the Picture shall be deemed automatic exercise of the Option and the Purchase Price shall be immediately due and owing.

2. CONSIDERATION.

2.1 Purchase Price. If Purchaser exercises the Option, Purchaser shall facilitate payment to Owner as full and complete consideration for all of the Rights (as such term is defined in Paragraph 3 below) granted herein, the following applicable purchase price of Three Hundred Fifty Thousand Dollars U.S. ($350,000) (the "Purchase Price"), plus the additional terms and consideration outlined below (in subsections (a) through (d)):

(a) Mark Brown is to be accorded "Executive Producer" credit for the documentary, in first position (as to any other executive producer(s)) on-screen and on all one-sheets, posters and paid ads, and of the same size, style, type and duration on-screen as other above-the-line entities and individuals on the Picture;

(b) Owner shall be accorded the sole production company credit for the Picture, substantially as follows: C4 Pictures in association with Gary Moore Productions" on-screen and on all one-sheets, posters and paid ads and of the same size, style, type and duration on-screen as other above-the-line entities and individuals on the Picture;

(b) Owner shall receive contingent participation (a/k/a "back-end" participation) equaling ten (10%) percent of the gross revenue received by Purchaser from any and all exploitation(s) of the Picture. As used herein, "Purchaser" shall mean and refer to 214 Films, and/or any entity controlled by 214 Films or its principal, Zatella Beatty, to which any part of the Rights or the right to collect revenue from exploitation of the Picture is assigned, without any doubling up. In no event shall the contingent or back-end participation received by Purchaser exceed that of Owner. Allowable recoupable expenses for Purchaser for the Picture shall be capped at $75,000 and Purchaser agrees to provide Owner copies of any and all hard expenses and/or costs it claims with respect to the Picture, if any.

(c) Mark Brown's Executive Producer fees, line-item fees and contingent or "back-end" participation (in the aggregate, as Executive Producer and Writer) on the feature documentary shall be no less favorable than that of Zatella Beatty.

2.2   Passive Payments:
If Purchaser desires to produce a sequel, remake, television series (scripted or non-scripted), mini-series or spin-off or other derivative picture or program based on either the Picture or the Property, Purchaser shall first negotiate with Owner in good faith regarding compensation for Owner pertaining to rights to the aforementioned production(s).

3.   **GRANT OF RIGHTS.**
Rights in the Property: Subject only to the proper exercise of the Option and payment of the Purchase Price (and excluding the rights specifically reserved to Owner in Paragraph 4.1 below), Owner assigns and sells to Purchaser, exclusively, in perpetuity and throughout the world, all right, title and interest in and to the Property including motion picture and television rights, and allied and ancillary rights thereto (the "Rights"), including, without limitation, all audiovisual rights in and to all forms of motion picture, television, digital television, videocassette and video or laser disc, any computer-assisted media (including, but not limited to CD-ROM, CD-I, DVD and similar disc systems, interactive media and any other methods and/or devices now existing and/or hereinafter devised), character (to the extent Owner can grant them), sequel, remake, sound record, music publishing, and merchandising. Purchaser and Owner acknowledge that Owner grants Purchaser exclusive rights to the actual events, likeness and life stories encompassed in the Property.

3.2   Preproduction Activities and Other Rights: Purchaser shall engage in meaningful consultation with Owner regarding the development, production, editing and marketing/promotion of the Picture.  Purchaser and Brown shall be free to engage writing partners in their collective discretion, to develop and write the Screenplay, in consultation with Owner.  Owner agrees to make themselves reasonably available to Purchaser during the Term and Extended Term.  Owner agrees that throughout the Option Period, and thereafter if the Option is exercised, Purchaser shall have the right, but not the obligation, to negotiate for and enter into agreements relative to the financing, development, production and distribution of any motion picture, documentary or other production or work based on the Property and to do any and all other acts customarily done by producers in connection with the development and production of a literary property for documentary features, television, motion pictures or otherwise. In addition, Purchaser shall have the right to vary, change, adapt, modify, interpolate in, transpose and/or rearrange, add material to and remove material from (herein collectively "revise") the Property as Purchaser shall deem appropriate, subject to meaningful consultation with Owner. Owner hereby waives the benefits of any provision of law known as the "droit moral" or any similar law in any country or territory of the world and agree not to institute, support or permit any action or lawsuit on the ground that the Picture or other production produced, distributed or exploited by Purchaser in any way constitutes an

infringement of any of Owner's moral rights or is in any way a defamation or mutilation of the Property or any part thereof or contains unauthorized variations, changes or translations. Should Purchaser not exercise the Option during the Option Period as granted herein all rights granted hereunder shall revert to Owner.

    3.3    Name, Likeness, Biography: Purchaser shall have the right to use and authorize others to use Owner's names, approved likenesses and approved biographical information pertaining to Owner for development, production, advertising and publicity purposes in connection with Purchaser's exploitation of any of the Rights granted hereunder, provided that such information shall not be used in connection with any merchandising or commercial tie-ups and provided that Owner shall not be portrayed as using or endorsing any product, service, or organization or cause without Owner's prior written consent.

**4.    RESERVED RIGHTS.**
The following rights ("Reserved Rights") are reserved to Owner, including the copyright therein, exclusively for Owner's use and disposition, subject to the terms of this Agreement:

    4.1    Publication Rights: The right to publish and distribute print editions of the Property in book and play form, whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise (subject to Purchaser's 7,500 word publication rights for advertising and promotional purposes and all other allied and ancillary rights therein), including photonovels, comic books, micro-documentary, microfiche, computer database; the right to publish recorded readings by a single narrator of the text of the Property in the form of audiocassettes, audiodiscs or similar audio-only devices individually purchased by the enduser; the right to publish the text of the Property as an electronic book, including, but not limited to in the form of CD-ROM, videocassette tape or similar electronically-read devices individually purchased by the end-user, or electronic transmissions via the internet. Such electronically-read editions may contain visual illustrations which are reproductions of the illustrations contained in the print edition of the Property, but may not contain images from the Picture. Such publications by Owner may be copyrighted in the name of Owner. It is agreed that neither party has the right to publish a novelization based on the Picture.

    4.2    Stage Rights: The right to perform the Property or adaptations thereof on the live stage with actors performing and appearing in the immediate presence of an audience (including cast album rights and merchandising rights in connection with such stage productions), provided no broadcast, telecast, photography, or the reproduction of such performance is made, except for archival purposes and for the use of customary excerpts in award programs and for advertising and publicity purposes solely in connection with the exploitation of such stage rights.

    4.3    Radio Rights: The right to produce for and broadcast on radio audio versions of the Property and adaptations thereof, subject to the radio rights sold and assigned to Purchaser hereunder.

      4.4    Live Television: The right to produce for and broadcast live on television versions of the Book and adaptations thereof.

      4.5    Author-Written Sequel: All rights in and to Author-Written Sequels and/or Prequels (i.e., a literary work whether written before or after the Property and whether written by Owner or by a successor-in-interest of Owner, in which one or more of the principal characters portrayed in the Property is portrayed in events and/or situations differing substantially from the events and situation in the Property), including but not limited to the right to write and publish Author-Written Sequels and/or Prequels.

      4.6    Foreign Distribution/Licensing Rights: All foreign motion picture, television and home entertainment rights, including foreign pay-per-view, VOD, sell through rights, outside of the United States and Canada territories, with respect to the Picture, are reserved to Owner. Further, Owner reserves said foreign rights as to any material developed by Purchaser during the Term or Extended Term.

**5.    HOLDBACK.**
    5.1 Holdback: Owner shall not assign, transfer, license, sell or otherwise dispose of, to any party other than Purchaser, the Reserved Rights under Paragraph 4.2 until two (2) years after the first general release of the Picture in the United States, or three (3) years after the date of exercise of the Option by Purchaser, whichever is first. After the expiration of such period, Owner may assign, transfer, license, sell and/or grant all or any part of such Reserved Rights.

**6. REPRESENTATIONS AND WARRANTIES.**
Owner hereby represents and warrants, to the best of its knowledge, that:

      6.1    Owner is the sole and exclusive Owner of all of the Rights herein granted to Purchaser in and to the Property, and Owner has the full and sole right, power and authority to enter into and perform this Agreement and to convey all of the Rights hereby conveyed to Purchaser;

      6.2    Owner is not subject to any obligation or disability which could or might prevent Owner from performing all of the covenants and conditions to be performed or kept by Owner hereunder, and will not hereafter make any grant, assignment, commitment, agreement or do any act which could or might interfere with the full and complete enjoyment by Purchaser of the rights granted hereunder;

      6.3    Except for material which is in the public domain or which is attributed, the Property is wholly original with Owner in all respects and no part thereof has been taken from or based upon any other literary, dramatic or musical material or any motion picture or television production (without permission or license) and the Property will not in any way infringe upon or violate any copyright, of any person, firm or corporation whatsoever. Notwithstanding the foregoing, Owner makes no representation, warranty or indemnity of any kind with respect to any material contained in the Property depicting real persons, other than that such

material as set forth in the Property does not infringe any copyright of any third party;

6.4   No part of the Rights herein conveyed to Purchaser have in any way been encumbered, conveyed, granted or otherwise disposed of in any manner adverse to the Rights granted to Purchaser hereunder, and the same are free and clear of any liens or claims whatsoever and to the best of Owner's knowledge there are no claims, litigation or other proceedings pending, outstanding or threatened which might in any way prejudice, interrupt, impair, limit, diminish or interfere with the Rights granted to Purchaser hereunder.

7.   **INDEMNIFICATION.**

7.1   Owner hereby indemnifies and agrees to hold Purchaser, its directors, employees, agents, successors, assigns and licensees harmless from and against any and all judgments, liabilities, damages, penalties, losses, claims and expenses (including reasonable outside attorneys' fees and disbursements) arising out of or in connection with any breach by Owner of any representations, warranties or agreements made by Owner in Paragraph 6 above.

7.2   Purchaser hereby indemnifies and agrees to hold Owner, its successors and heirs harmless from and against any and all judgments, liabilities, damages, penalties, losses, claims and expenses (including reasonable outside attorneys' fees and disbursements) directly arising out of or directly in connection with any material added to the Property by Purchaser or upon Purchaser's request, or arising out of the development, production and/or exploitation of the rights granted to Purchaser hereunder.

8.   **CREDITS.**

8.1 Subject to the terms and provisions of section 2 above, Purchaser agrees to accord Owner credit on the positive prints of the Picture (including any and all other exploitations of the Rights granted to Purchaser hereunder), on a separate card, in the main titles thereof in first position, and in a style, size and manner equal to that of the credit accorded to other above-the-line individuals, and in the billing block portion of all paid advertisements issued by or under Purchaser's control (subject to the usual and customary exclusions of the distributors of the Picture), substantially as follows: "Executive Producer… Mark Brown"

8.2   Subject to the foregoing, all other aspects of Owner's credit (if any) shall be determined in the sole discretion of Purchaser, if applicable, or the third party distributor and/or financier of the Picture.

9.   **REMEDIES.**
In the event of any breach or alleged breach of this Agreement by Purchaser, Owner shall have full remedies available in both law and equity.

10. **NO OBLIGATION TO PROCEED.**
Nothing contained herein shall in any way obligate Purchaser to utilize the Property or to produce, exhibit, advertise or exploit a documentary, motion picture, television program or any other work based on the Property.

11. **ASSIGNMENT.**
Purchaser may assign this Agreement and/or any of its rights hereunder to any person, firm or corporation, with prior notice to Owner and its counsel. Purchaser shall not be relieved of its obligations hereunder unless said assignee is a major motion picture studio, network, or distributor or a financially responsible and experienced third party corporation actively engaged in the art of producing motion pictures and which has a generally favorable reputation in the motion picture industry, which assumes in writing all of Purchaser's obligations hereunder as of the date of such transfer. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, executors, administrators, successors and assigns.

12. **ADDITIONAL DOCUMENTS.**
Owner shall sign further assignment and/or other written instruments which are reasonably necessary to carry out the purposes and intent of this Agreement. Owner hereby irrevocably appoints Purchaser (which appointment shall be coupled with an interest) attorney-in-fact of Owner solely to execute, acknowledge and deliver any such assignment or instrument if Owner shall be unavailable to execute or does not execute, acknowledge or deliver same within five (5) business days of Purchaser's written request. Purchaser shall promptly thereafter provide copies of such documents to Owner and its counsel.

13. **NOTICES.**
All notices hereunder shall be in writing and shall be deemed given hereunder on the date delivered by hand or a date forty-eight (48) hours after the date mailed by certified mail. Until further written notice, the addresses of the parties shall be as follows:

Owner:
C4 Pictures, Inc.
8033 Sunset Blvd., Ste. 971
Hollywood, CA 90046
Attn: Mark Brown

with a courtesy copy to:
Igbodike Obioha, Esq.
Berger Kahn, ALC
4551 Glencoe Ave., Suite 300
Marina del Rey, CA 90292

Purchaser:
214 Films, Inc.
Address:
Attn: Zatella Beatty

14. **PAYMENTS.**
Owner irrevocably directs that all money due her hereunder shall be paid to them to:

Owner:
C4 Pictures, Inc.
8033 Sunset Blvd., Ste. 971
Hollywood, CA 90046
Attn: Mark Brown

### 15. TRAVEL AND EXPENSES.
Should Purchaser request Owner or Owner's principal to travel more than fifty (50) miles from Owner or its principal's main residence to participate in any manner of development, production or exploitation of the Rights herein granted, Purchaser shall provide Owner with standard travel and accommodations and a reasonable per diem.

### 16. REVERSION.
If Purchaser exercises the Option, but principal photography of the Picture does not commence within six (6) months of such exercise, all Rights herein granted, shall revert to Owner subject to repayment of the Purchase Price by Owner to Purchaser.

### 17. MISCELLANEOUS.
(a) The titles of the paragraphs of this Agreement are for convenience only and shall not in any way affect the interpretation of this Agreement;

(b) Concurrently with execution of this Agreement, Owner shall provide Purchaser with any and all written agreements entered into between Owner and third parties regarding the development and production of the Picture which precede this Agreement; and both parties agree and consent that all such agreements with respect to the Property and the directing and producing of the Picture shall be maintained by Purchaser and survive this Agreement;

(c) This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts entered into and fully performed therein. The prevailing party in any action brought to interpret or enforce the terms of this Agreement shall be entitled to recover its costs and expenses incurred therefore, including reasonable attorney's fees;

(d) E&O - Purchaser shall include Owner as an additional insured on Purchaser's standard errors and omissions insurance policy;

(e) Video - Purchaser shall provide Owner with a videotape and DVD copy of the final, street-ready version of the Picture for personal use, when and if such copies become available;

(f) Premiere - If the Picture is produced or caused to be produced by Purchaser or Purchaser's assignee, Owner shall receive four (4) invitations to the premiere screening of the Picture, if any;

(g) Purchaser agrees to use commercially reasonable efforts to arrange for Owner (and/or any publisher as designated by Owner) to be permitted to use the "key art" (if

any) utilized in connection with the publicity of the Picture on the cover of any book publication of the Property.

**18. ENTIRE AGREEMENT.**

This Agreement contains the entire understanding of the parties hereto relating to the subject matter hereof and supersedes any prior understandings or agreements between the parties. This Agreement may not be modified or amended except in writing signed by both parties.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

AGREED AND ACCEPTED:

_____
Mark Brown
Individually and for C4 Pictures, Inc.


_____
Zatella Beatty
Individually and for 214 Films, Inc.